UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| United States of America, | CR 05-94 JRT/FLN |
| Plaintiff, | |
| v. | **REPORT AND RECOMMENDATION** |
| **01 - Anthony Heppner**, | |
| **02 - Thomas Anderson,** | |
| Defendants. | |

Francis J. Magill, Jr. Asst. U.S. Attorney, for the Government.
Dean S. Grau, Esq., for Defendant Heppner.
Thomas G. Dunnwald, Esq., for Defendant Anderson.

The above referenced matter came before the undersigned United States Magistrate Judge on April 27, 2005, on Defendants' joint pretrial motions. Defendant Anthony Heppner ("Defendant Heppner") and Defendant Thomas Anderson ("Defendant Anderson") have both made a Motion to Dismiss the Indictment [#19]; and Defendant Heppner has also made a Motion to Suppress Statements [#26][1]. For the reasons stated below, this Court recommends that the Defendants' Motions [#19 and #26] should all be Denied.

## I. FINDINGS OF FACT

Defendants Heppner and Anderson are both charged with twenty Counts of Mail Fraud in violation of Title 18 U.S.C. §§ 2 and 1341. (See Indictment [#1]). The Indictment alleges that from January 1999 until February 2001, the Defendants aided and abetted each other to devise a scheme

---

[1] Although styled as "Joint Motion to Suppress Statements," Defendant Anderson made no statements.

to defraud and obtain money and property by means of materially false and fraudulent pretenses, representations, and promises. (Id., 2). In addition, the Indictment alleges that Defendants knowingly caused to be sent, delivered, and moved by the United States Postal Service mail for the purpose of executing such a scheme in violation of Title 18 U.S.C. §§ 2 and 1341. (Id., 2). The Indictment alleges that around January 1999, Defendant Heppner, a resident of Minnesota, and Defendant Anderson, a resident of Wisconsin, formed an investment club called Skyward Group and represented that they were on the board of directors of the group. (Id.). Around that time, according to the Indictment, Defendants began soliciting individuals for membership. Id. Membership was obtained by providing funds that Skyward Group would invest in various investment opportunities. (Id.). Defendants gave potential members a document titled "Skyward Group Loan Agreement," which explained that a member was providing a "no interest, unsecured, unsolicited loan" to Skyward Group, that there "was no guarantee of earnings", and that any return was "purely on a best efforts basis." (Id., 2). The minimum "loan" amount was $1,000 and members had to pay an annual membership fee. (Id.).

The Indictment goes on to charge that as part of the scheme, Defendants fraudulently obtained money from individuals by falsely representing and causing others to falsely represent to others that Defendants would invest their funds and would generate substantial returns. (Id., 3). The truth was that Defendants intended to use the funds for their own personal use and benefit. (Id.) Also, part of the scheme was to entice members to make false and misleading representations to others by promising additional compensation to members who recruited new members. (Id.). Defendants would intentionally withhold material information regarding the status of the funds Skyward Group had received. (Id.). Defendants issued written updates misrepresenting the status

of those funds and sent Benefit Reports to members misrepresenting that their funds still existed or had received earnings. (Id.). The Indictment alleges that, in reality, almost all of the funds had been either lost in an overseas investment or were being diverted by Defendants for their own personal use or benefit. (Id., 4). Approximately $1.8 million was deposited into the Skyward Group account, of which $1 million was diverted for Defendants' personal use or benefit. (Id.).

The twenty counts reflect correspondence sent and received by the Defendants through the U.S. mail. These included the following correspondence: payment of dues from multiple members to Skyward Group; acknowledgment of dues received from Skyward Group to multiple members; a money order to Skyward Group; Skyward Updates; Voting sheets from Skyward Group to members; Skyward Loan Agreements signed by Defendant Heppner sent to members; Skyward voting forms from Skyward Group to members; Postcard with update on Skyward voting; Postcards from Skyward Group to members stating that Skyward was still in a waiting stage or holding period; and, Letters to investors with voting options from Skyward Group.

## II. CONCLUSIONS OF LAW

**I.      Defendants' Motion to Dismiss the Indictment [#19] Should be Denied.**

Defendants Heppner and Anderson jointly move to Dismiss the Indictment on the grounds that the federal government does not have jurisdiction over the charges brought against them and the prosecution of some of the alleged crimes is barred by the statute of limitations.

Fed.R.Crim.Pro 7(c)(1) states that an indictment must be "a plain, concise, and definite written statement of the essential facts constituting the offense charged and must be signed by an attorney for the government." In addition, an indictment must give the statute, rule or "other provision of law that the defendant is alleged to have violated." Id. An indictment normally will be

deemed sufficient unless no reasonable construction can be said to charge an offense. See U.S. v. Morris, 18 F.3d 562, 568 (8th Cir. 1994). To be sufficient, the indictment must set forth the essential elements of the crime. See United States v. Opsta, 659 F.2d 848 (8th Cir. 1981) (citing United States v. Vesaas, 586 F.2d 101, 103 (8th Cir. 1978)). Whether or not a defendant actually participated in the acts alleged in the indictment is a question of fact for trial.

The Mail Fraud Statute, Title 18 U.S.C. § 1341, provides the following:

> "Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years, or both."

The main elements the Government must prove in a § 1341 violation are: "(1) a scheme conceived [of] . . . for the purpose of defrauding . . . by means of false pretenses, representations or promises, and (2) use of the United States mails in furtherance of the scheme." U.S. v. Nance, 502 F.2d 615, 618 (8th Cir. 1974), quoting Gold v. U.S., 350 F.2d 953, 956 (8th Cir. 1965); see also Pereira v. U.S., 347 U.S. 1, 8 (1954); U.S. v. Moss, 591 F.2d 428, 435 (8th Cir. 1979). Schemes in which a defendant solicits funds from misinformed investors by engaging in deceptive practices are considered within the mail fraud statute. U.S. v. McNeive, 536 F.2d 1245, 1249 (8th Cir. 1976); citing e.g., Pereira, 371 U.S. 1 (1954); U.S. v. Comyns, 248 U.S. 349 (1919); U.S. v. Cohen, 516 F.2d 1358 (8th Cir. 1975); Easter v. U.S., 441 F.2d 425 (8th Cir. 1971).

The mailing element of § 1341 consists of two requirements: "(1) that the defendant 'caused' the use of the mails, and (2) that the use was 'for the purpose of executing' the scheme to defraud." Moss, 591 F.2d at 436, citing U.S. v. Maze, 414 U.S. 395, 399-400 (1974); Kann v. U.S., 323 U.S. 88, 93-95 (1944). To be within the ambit of the mail fraud statute, the mailings do not need to be an essential element of the scheme. Pereira, 347 U.S. at 8; Moss, 591 F.2d at 437. The evidence must show that the mailings are "sufficiently closely related" to the scheme, or "incident to an essential part of the scheme." Maze, 414 U.S. at 399; Pereira, 347 U.S. at 8; Moss, 591 F.2d at 437 (confirmation letter facilitated the handling and processing of scheme to defraud, thus incident to an essential part of the scheme and brings conduct within statute). "Mailings are in furtherance of a scheme if they are incidental to an essential part of the scheme." U.S. v. Rauhoff, 525 F.2d 1170, 1176 (7th Cir. 1975), citing, Pereira, 371 U.S. 1 (1054). Mailings that occur after the fruition of a scheme are generally not considered to be in furtherance of the scheme. U.S. v. Maze, 414 U.S. 395 (1974). However, mailings which relate to the acceptance of the profits from a scheme, which are made to promote the scheme, or which work to conceal the scheme, are considered to be in furtherance of a scheme to defraud and within the mail fraud statute. See Rauhoff, 525 F.2d at 1176, (it cannot be said that mailings which occur subsequent to the fraudulent acts may never be in furtherance of the scheme), citing, U.S. v. Sampson, 371 U.S. 75 (1962); U.S. v. Isaacs, 493 F.2d 1124 (7th Cir. 1974); U.S. v. Joyce, 499 F.2d 9 (7th Cir. 1974); see also, U.S. v. Lane, 474 U.S. 438 (1986); U.S. v. Taylor, 789 F.2d 618 (8th Cir. 1986). A mailing may be routine or even sent for a legitimate business purpose as long as it helps unfold the scheme. U.S. v. Nelson, 988 F.2d 798, 804 (8th Cir. 1993).

Defendant relies on Kann in alleging that because the use of the mail in this case was incidental, the federal court really has no jurisdiction over the charges in this case and they should be heard in state court. 323 U.S. 88 (1944). In Kann, corporate officers and directors were alleged to have set up a "dummy corporation" in order to divert their corporation's profits for their own personal use. The scheme involved cashing or depositing checks at a bank which were fraudulently obtained and payable to themselves. The checks were then mailed by the bank for collection to the drawee bank. The Court in Kann found that the mailing of cashed checks to drawee banks did not satisfy the mailing element of § 1341 because by cashing the checks, the defendants received the money they intended to receive under the scheme and "[t]he scheme in each case had reached fruition. Id., at 94.

> "The persons intended to received the money had received it irrevocably. It was immaterial to them, or to any consummation of the scheme, how the bank which paid or credited the check would collect from the drawee bank. It cannot be said that the mailings in question were for the purpose of executing the scheme, as the statute requires."

Id.. The checks were mailed for the banks' own purposes and not in the furtherance of the fraudulent scheme. Sampson, 371 U.S. at 79-80. However, Courts are deliberate in pointing out that Kann and other cases like it, did not create an automatic rule that use of the mail after money has been received is never done for the purposes of executing the scheme. Id. Indeed, "Court of Appeals decisions rendered both before and after Kann have followed the view that subsequent mailing can in some circumstances provide the basis for an indictment under the mail fraud statutes." Id., citing, Friedman v. U.S., 347 F.2d 697, 710 (8th Cir. 1965); see also U.S. v. Miles, 483 F.2d 1372 (8th Cir. 1973). In addition, the Court in Kann specifically warned that their finding was to be distinguished from cases "where the mails are used prior to, and as one step toward, the

receipt of the fruits of the fraud." Kann, 323 U.S. at 94, citing U.S. v. Kenofskey, 243 U.S. 440 (1917).

In this case, the use of the mail was part of, or a step toward, the receipt of the fruits of the fraud. The facts alleged in this case do not show, and Defendants do not argue, that the scheme had reached fruition before the use of the mail occurred. Unlike Kann, where the defendants had completed their frauds each time they cashed a check, in this case, the Defendants allegedly engaged in a continuous fraud and it was important to their scheme to send ongoing mailings as updates, to solicit more members, and to pressure current members to solicit others. Indeed, the Grand Jury here alleges Defendants' scheme was not completed as they continued to receive the proceeds from their scheme and allegedly required yearly membership fees along with their initial "loan."

Within their Motion to Dismiss the Indictment [#19], Defendants also argue that prosecution of some of the crimes alleged in the Indictment is barred by the statute of limitations. The mail fraud statute, 18 U.S.C. § 1341, has a five year statute of limitations. See 18 U.S.C.A. § 3282; U.S. v. Strada, 503 F.2d 1081, 1085 (8th Cir. 1974). On March 22, 2005, the Defendants were indicted on twenty counts of mail fraud. While the Indictment alleges that the overall scheme took place from January 1999 until February 2001, the twenty Counts of mail fraud Defendants are actually being charged with took place between March 24, 2000, and September 1, 2001. All of the Counts are within § 1341's five year statute of limitations. As such, none of the crimes alleged in the indictment are barred by the statute of limitations.

Defendants' Motion to Dismiss the Indictment [#19] should be Denied.

## II. Defendant Heppner's Motion To Suppress Statements [#26] Should be Denied.

Defendant Heppner moves to suppress the statement he made when he was subpoenaed to testify before the Commodity Futures Trading Commission on September 5, 2000, in an unrelated case. Defendant Anderson did not make any statements. Defendant Heppner argues that the government should prove that his statements were voluntarily made before they may use it against Defendant in this case.

While a witness subpoenaed to testify before a commission may not refuse to take the stand, be sworn, and to testify, they may assert their 5th Amendment privilege against self-incrimination and refuse to answer questions that would incriminate them. See Murphy v. Waterfront Com'n of N.Y. Harbor, 378 U.S. 52 (1964); Blair v. U.S., 250 U.S. 273, 280-282 (1919). As long as fraud or duress is not used on the witness, there is no obligation to warn such a witness of his privilege against self-incrimination. See U.S. v. Miller, 80 F.Supp. 979, 982 (D.C. Pa. 1948); Thompson v. U.S., 10 F.2d 781, 784 (7th Cir. 1928); U.S. v. Block, 88 F.2d 618 (2nd Cir. 1937). "A witness, upon oath, must claim his privilege in no uncertain terms at the proceeding in which the information is sought or he will not thereafter be considered to have been 'compelled' within the meaning of the Amendment." Miller, 80 F. Supp. at 982, citing Vajtaur v. Commissioner of Immigration, 273 U.S. 103, 113 (1927); U.S. v. Monia, 317 U.S. 424, 427 (1943); see also U.S. v. Mandujano, 425 U.S. 564 (1975).

Heppner's testimony before the Commodity Futures Trading Commission was received in evidence as Gov't Ex #1. A review of that transcript shows that Defendant Heppner was informed of his 5th Amendment right to refuse to answer questions which may incriminate him, but did not assert any such privilege during the hearing. Moreover, it also appears that Heppner was advised

of his right to be represented by counsel at the hearing. Heppner testified that he had consulted with a couple of different counsel, but appeared at the hearing unrepresented by counsel. Gov't Ex. #1 at pp.6-9. There is no evidence that fraud or duress was used at the hearing. As such, his testimony during the hearing can not be considered to have been involuntary. There is nothing in <u>Miranda</u> or 5th Amendment jurisprudence requiring his statements to be suppressed and his Motion to Suppress [#26] should be Denied.

### III. RECOMMENDATION

Based upon all the files, records and proceedings herein, **IT IS HEREBY RECOMMENDED** that Defendant Heppner's and Defendant Anderson's Motions be **DENIED** as follows:

1.  Defendants' Motion to Dismiss the Indictment [#19] should be **DENIED**; and

2.  Defendants' Motion to Suppress Statements [#26] should be **DENIED**.


DATED: May 27, 2005.                         s/ Franklin L. Noel
                                             FRANKLIN L. NOEL
                                             United States Magistrate Judge


Pursuant to the Local Rules, any party may object to this Report and Recommendation by filing with the Clerk of Court and serving on all parties, on or before **June 17, 2005**, written objections which specifically identify the portions of the proposed findings or recommendations to which objection is being made, and a brief in support thereof. A party may respond to the objecting party's brief within ten days after service thereof. All briefs filed under the rules shall be limited to ten pages. A judge shall make a de novo determination of those portions to which objection is made.

Unless the parties are prepared to stipulate that the District Court is not required by 28 U.S.C. § 636 to review a transcript of the hearing in order to resolve all objections made to this Report and Recommendation, the party making the objections shall timely order and cause to be filed by **June 17, 2005** a complete transcript of the hearing.

This Report and Recommendation does not constitute an order or judgment of the District Court, and it is, therefore, not appealable to the Circuit Court of Appeals.